IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CLAUDE A. KING,** | * | |
| Plaintiff, | * | |
| v. | * | Case No.: DLB-21-1627 |
| **WARDEN JEFF NINES and ASRESAHEGN GETACHEW, M.D.,** | * | |
| | * | |
| Defendants. | | |
| | * | |

**MEMORANDUM OPINION**

Self-represented plaintiff Claude A. King, a Maryland state inmate, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 after he tested positive for COVID-19 and received what he believes was inadequate medical care. He claims defendant Asresahegn Getachew, M.D. was deliberately indifferent to his serious medical need and defendant Warden Jeff Nines failed to follow COVID-19 protocols in violation of the Eighth Amendment. ECF 1. Dr. Getachew and Warden Nines each filed a motion to dismiss, or in the alternative, for summary judgment. ECF 15, 16. King filed verified oppositions to both motions. ECF 18, 21. Dr. Getachew filed a reply. ECF 20.[1] All parties filed exhibits in support, including King's medical records, ECF 15-4, 15-5, 15-6.

---

[1] King subsequently filed a letter to the Court in which he addressed Dr. Getachew's reply. ECF 22. Dr. Getachew construed this letter as a surreply and moved to strike it because it was filed without leave of the Court. ECF 23. Unless otherwise ordered, a surreply is not permitted. *See* Loc. R. 105.2(a) (D. Md. 2021). Although this Court disfavors surreplies, it may permit one "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Medish v. Johns Hopkins Health Sys. Corp.*, 272 F. Supp. 3d 719, 722 (D. Md. 2017) (quoting *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D. Md. 2003)). Dr. Getachew has not raised new matters for the first time in his reply. Therefore, Dr. Getachew's motion to strike King's surreply is granted.

For the reasons discussed below, Dr. Getachew's motion, construed as a motion for summary judgment, will be granted, and Warden Nines' motion to dismiss for failure to exhaust administrative remedies will be granted. Having reviewed the submitted materials, the Court finds no hearing necessary. *See* Loc. R. 105.6 (D. Md. 2021).

## I.   Background

On November 16, 2020, King tested positive for COVID-19. ECF 15-6, at 62. Dr. Getachew ordered a 14-day period of isolation with "twice-daily temperature and oxygen saturation checks." ECF 15-3, at 4; ECF 15-6, at 8–9. Travis Barnhart, L.P.N., updated King's chart to note the positive COVID-19 test and Dr. Getachew's instructions. ECF 15-6, at 8. Dr. Getachew states he "believed that a member of the nursing staff would inform the patient of his COVID-19 result." ECF 15-3, at 4. King agrees this "was a reasonable assumption given the order for immediate quarantine he issued." ECF 18, at 3. On November 24, April D. Kiser, L.P.N., updated King's chart to note the discontinuation of isolation and twice-daily vital checks. ECF 15-6, at 9.

A document submitted by the defendants titled "Vital Signs Monitor" shows that King's temperature and oxygen saturation were checked ten times (approximately twice daily) by various nurses between November 18 and November 23. ECF 15-6, at 63. The record has columns for what appear to be temperature, weight, oxygen saturation, peak flow, and comments. It reflects apparent temperature readings from 97 to 99, although only one reading appears in the column for temperature and nine readings appear in other columns. This document is dated both November 16, 2020 (the date of King's positive COVID-19 test) and December 1, 2021 (shortly before the defendants filed their dispositive motions in this case). *Id*.

King asserts that the "Vital Signs Monitor" document was forged, that the medical records for the relevant period do not show that he was placed in isolation, that he was not in fact isolated, and that the monitoring never happened. ECF 18, at 4–5, 7. In support, King submits his verified opposition, *id.*, and the affidavit of his cellmate Jason Mitchell, who states that "at no time did anyone ever come to our cell to check either of our temperatures or oxygen saturation in line with COVID-19 protocols." ECF 18-8, at 1.[2]

King insists Dr. Getachew was deliberately indifferent because he did not follow up to ensure isolation and daily vital checks, did not meet with him in person, did not order a second test, and did not check his medical record to learn he had a "prior existing vulnerability to the ravages of COVID." ECF 18, at 7–9. He also criticizes Dr. Getachew for not informing him of his positive test result until March 8, 2021. *Id.* at 13.

According to King's July 1, 2021 pleadings, King had "been suffering since September, with bad coughing, still hard to breathe, using asma [sic] spray, headaches, [and] thick mucus in [his] throat." ECF 1, at 2. He alleges that he "could have died" because he has "chronic bronchitis brought on by seasonal allergies to pollen and mold." ECF 1, at 2; ECF 18, at 8. King claims that he contracted COVID-19 because Warden Nines did not follow proper COVID-19 protocols. *Id.*

In contrast to King's allegations, according to his medical records from September 2020 until he met with Dr. Getachew in March 2021, King did not complain of or show COVID-19 symptoms. He placed numerous sick call requests about other issues. *See* ECF 15-5, at 7–8, 9, 10–14, & 56–69 (sick call requests for colon check, medication refill, and knee sleeve; complaints of knee pain, blisters, and skin rash). He had medical exams in September and October 2020 and

---

[2] Other than the "Vital Signs Monitor" document, King does not dispute the medical records that Dr. Getachew submitted, ECF 15-4; 15-5; 15-6.

February 2021 that showed he was breathing normally, and the practitioners did not note any COVID-19 symptoms. ECF 15-5, at 56–57, 60; ECF 15-6, at 6, 11; *see also* ECF 15-6, at 1 (September 28 medical appointment notes with no mention of any COVID-19 symptoms); ECF 15-6, at 52 (negative COVID-19 test on September 25).

On March 8, 2021, King saw Dr. Getachew via telemedicine for a skin rash and knee pain. *Id*. at 13. Dr. Getachew recommended an onsite provider visit to evaluate the rash. *Id*. He reviewed lab results and noted that King's liver function had improved and that other results were normal. *Id*. On March 10, 2021, King saw Amethyst P. Marsh, R.N. regarding the rash and knee pain. *Id*. at 14. She noted that King's respirations were even and easy. *Id*. She referred him to a provider for evaluation and treatment. *Id*. at 15. On April 1, 2021, King received his first dose of the COVID-19 vaccine. ECF 15-6 at 18.

King first complained of coughing, difficulty breathing, and chest pain on April 19, 2021, when he saw Howard P. Cook, M.D. for his skin rash, knee pain, and breathing difficulties, and requested an inhaler. ECF 15-6, at 22. Dr. Cook prescribed an inhaled steroid and ordered a dermatology consult. *Id*.; *see also id*. at 20. On May 5, 2021, King saw Jennifer L. VanMeter, R.N., for chest pain. ECF 15-6, at 25. An EKG was abnormal, but King's lungs sounded clear bilaterally. *Id*. Nurse VanMeter noted that King had tested positive for COVID-19 in November 2020. *Id*. Dr. Getachew gave approval to send King to the emergency department, and he was transported to the Western Correctional Institution ("WCI") infirmary where he saw Rhoda L. Cornwell, R.N. at 1:45 a.m. that night. *Id*. at 25, 28. His lungs were clear with a dry persistent cough after each deep breath. *Id*. Nurse Cornwell saw King again less than an hour later, and he reported that he felt much better. *Id*. at 30. She noted that his respirations were even and unlabored. *Id*. At 12:32 p.m. on May 6, Patrick F. O'Neil, M.D. saw King and discharged him

after King reported feeling much better and denied chest pain, dyspnea, or any other concerns. *Id*. at 32. Dr. O'Neil ordered a cardiovascular chronic care visit in three months. *Id*. The next day, he received his second dose of the COVID-19 vaccine. ECF 15-6, at 35.

On June 3, 2021, King saw Nurse Hoover for chest pain and shortness of breath. ECF 15-6, at 36. He underwent an EKG that showed lateral ischemia. *Id*. Hoover reviewed the case with Dr. Cook and Dr. Getachew, gave him medication, and sent him to the emergency room. *Id*. King was admitted to the WCI infirmary after undergoing a chest CT, chest x-ray, and labs, which were all negative. *Id*. at 38. He reported discomfort in his chest but did not rate the pain. *Id*. King's lungs were clear and he had no cough. *Id*. Late that evening, King reported that the chest pain had improved, but it was still present. *Id*. at 40. King continued to be monitored until June 4, 2021, at which point he was discharged and returned to North Branch Correctional Institution. *Id*. at 41–46. At discharge, blood pressure checks twice weekly were ordered to be reviewed by the chronic care clinic in one month. *Id*. at 46.

## II.     Standard of Review

Defendants move to dismiss the complaint for failure to state a claim or alternatively for summary judgment.

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the

defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)). The Court does not "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the Court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the Court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438

F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)).  Thus, a pro se complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'"  *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, at 637 (4th Cir. 2016) (quoting *King v. Rubenstein*, 825 F.3d 206, 212, 214 (4th Cir. 2016) (quoting *Twombly*, 550 U.S. at 570)).

The Court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs.  *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c).  The Court also may consider documents integral to and explicitly relied on in the complaint when their authenticity is not disputed.  *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).  When the parties present and the Court considers matters outside the pleadings on a Rule 12(b)(6) motion, the Court must treat the motion as one for summary judgment under Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

Warden Nines asks the Court to dismiss the complaint as to him because King has not exhausted his administrative remedies.  In support of his motion, Nines submitted King's ARP appeal and the order dismissing the appeal.  ECF 16-2, at 17–18.  Even though the Court will consider these documents to resolve Nines' motion, it will not convert the motion into one for summary judgment.  King discusses in his complaint his efforts to exhaust administrative remedies, including the dismissal of an administrative appeal he filed.  ECF 1, at 2.  Because the appeal and administrative dismissal are relied on in the complaint, integral to it, and the authenticity of the ARP appeal and dismissal order is not disputed, the Court may consider them in resolving Warden Nines' motion without converting it into a summary judgment motion.  *See Zak*, 780 F.3d at 607.

As for Dr. Getachew's motion, King received sufficient notice that it may be treated as a summary judgment motion. On January 17, 2022, the Court sent notice advising King that the motion could be construed as one for summary judgment and could result in the entry of judgment against him. ECF 17. Moreover, the motion identifies summary judgment as possible relief and provides sufficient notice for King to have a reasonable opportunity to present relevant evidence in support of his position. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Additionally, King submitted a verified opposition and a declaration as evidence in support of his opposition to Dr. Getachew's motion. Thus, the Court is satisfied that King has been advised that Dr. Getachew's motion could be treated as one for summary judgment and that he has been given a reasonable opportunity to present materials in response to the motion. The Court will resolve the motion under Rule 56.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205

(quoting *Anderson*, 477 U.S. at 249).  However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper.  *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party."  *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

### III.   Discussion

#### A.   Defendant Warden Nines

Warden Nines raises the affirmative defense that King has failed to exhaust his administrative remedies.  ECF 16-1, at 5.  The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Exhaustion under § 1997e(a) is mandatory, and therefore the plaintiff must exhaust his available administrative remedies before this Court will hear his claim.  *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *Jones v. Bock*, 549 U.S. 199, 215–16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F. 2d 674, 682 (4th Cir. 2005).  Consequently, if King has not properly presented any of his claims through an available administrative remedy procedure, that claim must be dismissed pursuant to the PLRA.  *See Ross*, 136 S. Ct. at 1857.

An administrative remedy procedure process applies to all Maryland prisons.  Md. Code Regs. ("COMAR") 12.02.28.01 *et seq.*  A prisoner seeking redress for a rights violation must follow that process, beginning with filing an ARP request with the prison's managing official.  Md.

9

Code Ann., Corr. Servs. § 10-206(b); COMAR 12.07.01.04; *see Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006) (to exhaust administrative remedies, a prisoner must complete "the administrative review process in accordance with the applicable procedural rules").  If his ARP request is dismissed, he can challenge the decision by filing an appeal with the Commissioner of Corrections. COMAR 12.07.01.05C.  If he is dissatisfied with the result when he completes that procedure, he may file a grievance with the Inmate Grievance Office ("IGO").  Corr. Servs. §§ 10-206(a), 10-210; COMAR 12.07.01.03, 05B.  The IGO may refer the complaint to an administrative law judge ("ALJ") for a hearing or dismiss it without a hearing if it is "wholly lacking in merit on its face." Corr. Servs. §§ 10-207, 10-208; Cts. & Jud. Proc. § 10-208(c); COMAR 12.07.01.06A, .07, .07B, .08.  If the IGO dismisses the complaint, its dismissal serves as a final agency determination.  Corr. Servs. §§ 10-207(b)(1).  If the complaint is referred to an ALJ, the ALJ provides a proposed decision to the Secretary of Department of Public Safety and Correctional Services.  *See* Corr. Servs. § 10-209(b)–(c).  The Secretary, in turn, makes a final agency determination.  *See id.*

      Here, King fails to provide a meaningful response to Warden Nines' affirmative defense. ECF 21.  King recites what he believes to be the "firmly established" facts of his case, which do not include anything regarding administrative remedies.  He then summarily concludes, "[t]hus, the instant action was filed after full exhaustion of all available Administrative Remedies." *Id*. at 2–3.  He does not provide any facts or evidence to support his conclusion.  The record includes an appeal of a denial of King's ARP, in which he complained that the Warden and his officers were not following safe COVID-19 protocols.  ECF 16-2, at 17–18.  The appeal was dismissed for procedural reasons, and King was instructed to submit a copy of the original ARP and/or the Warden's response.  *Id*.  Nothing in the record shows that King submitted the required paperwork. In fact, King states in his unverified complaint that he did not proceed because he received the

10

decision too late to timely comply.[3]  ECF 1, at 2.  King does not state that he made any attempt to submit the documents, request an extension, or otherwise attempt to cure the deficiencies in his grievance.  Because King did not exhaust the administrative process as to his claims against Warden Nines, those claims are dismissed without prejudice.[4]

### B. Defendant Dr. Getachew

Section 1983 provides a federal cause of action for any individual who believes a person acting under color of state law has deprived him or her of a constitutional right.  *See* 42 U.S.C. § 1983; *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 707 (1999).  Under the Eighth Amendment, the government must "provide medical care for those whom it is punishing by incarceration."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  Any "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  To prevail on his constitutional claim against Dr. Getachew based on the alleged inadequate provision of medical care, King must establish that Dr. Getachew's actions or his failure to act amounted to "deliberate indifference to serious medical needs."  *See id.* at 106; *see also Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021); *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).  He must show that "his medical condition was objectively serious—that is, 'one

---

[3] The Commissioner's decision is dated April 9, 2022, and requires the additional documents be submitted by April 24, 2022.  ECF 16-2.  King contends that he did not receive the decision until April 23, 2022.  ECF 1, at 2.

[4] Because King's claims against Warden Nines are dismissed for failure to exhaust administrative remedies, the Court need not reach Warden Nines' other arguments.  However, insofar as Warden Nines asserts there is no respondeat superior liability under § 1983, the Court agrees:  it is well established that the doctrine of respondeat superior does not apply to § 1983 claims.  *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).  Therefore, an official will be found liable only if the plaintiff shows the official "acted personally in the deprivation of the plaintiff['s] rights."  *Vinnedge*, 550 F.2d at 928 (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)).

that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Hixson*, 1 F.4th at 302 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). King also must demonstrate that the official subjectively knew of and disregarded an excessive risk to the inmate's health or safety. *Id.* "[I]t is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). An inmate can show subjective knowledge "through direct evidence of actual knowledge or through circumstantial evidence," such as evidence that "'the risk was obvious.'" *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).

"Deliberate indifference is a very high standard." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting" one). "[T]he treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson*, 1 F.4th at 303 (quoting *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990)). It requires "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835). Deliberate indifference will not be found if "prison officials [who] are aware of a serious medical need . . . "respond[ ] reasonably to the risk." *Id.* at 302 (quoting *Farmer*, 511 U.S. at 844). Thus, "'[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." *Id.* at 302–03 (quoting *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).

A delay in medical care violates the Eighth Amendment if, objectively, it put the inmate "at a 'substantial risk' of 'serious harm'" and "the defendants 'subjectively recognized' that there was such a risk and that their 'actions were inappropriate in light of that risk.'" *Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) (quoting *Scinto*, 841 F.3d at 225, and then *Anderson*, 877 F.3d at 545); *see Smith v. Smith*, 589 F.3d 736, 738–39 (4th Cir. 2009) ("mere delay . . . can be sufficient to constitute a violation of the Eighth Amendment" if "'the prison official acted with a sufficiently culpable state of mind and . . . [that] the deprivation suffered or injury inflicted on the inmate was sufficiently serious.'" (quoting *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008)). A delay causes substantial harm if the result is "a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (citing *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008)); *see also McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.").

The issues here are whether King's COVID-19 infection was a serious medical condition and, if so, whether Dr. Getachew was deliberately indifferent to it.[5]

King has not established that he had a serious medical need. Certainly, COVID-19 can be serious and even life-threatening, and King did test positive for COVID-19 in November 2020. But there is nothing in King's medical records indicating he suffered any symptoms of COVID-19 at that time or in the ensuing months. King's statement that he has been suffering from untreated COVID-19 symptoms since September 2020 (two months before his positive test) is

---

[5] King argues at length about what he views as the failings of defendants and others in maintaining a safe environment at the prison with regard to COVID-19. ECF 18. However, most of these arguments and allegations are not relevant to King's claim that Dr. Getachew was deliberately indifferent to King's serious medical need. As such, the Court need not address those issues.

blatantly contradicted by the record. The medical records establish that King submitted multiple sick calls and had multiple provider visits for issues unrelated to COVID-19, such as knee pain and a skin rash. ECF 15-5, at 7–8, 9, 10–14, & 56–69; ECF 15-6, at 6, 11, 13–14. Providers repeatedly noted clear lungs and breathing during examinations. ECF 15-5 at 56-57, 60; 15-6 at 6, 11, 14. Additionally, there is nothing in the record to indicate that King has a pre-existing condition that made him particularly susceptible to a serious illness due to COVID-19. King alleges that he suffers from chronic bronchitis due to seasonal allergies and therefore could have died from COVID-19. ECF 18, at 7. However, the medical records do not include any reference to chronic bronchitis, seasonal allergies, or any other pre-existing condition that would make him more susceptible to serious illness resulting from a COVID-19 infection. And even if King has these pre-existing conditions, there is no evidence they caused him serious illness when he contracted COVID-19. His positive COVID-19 test alone does not establish that he had a serious medical need. Because there is no evidence that King had a serious medical need, Dr. Getachew could not have been deliberately indifferent. *See Hixson*, 1 F.4th at 302.

Moreover, even if asymptomatic COVID-19 were considered a serious medical need, in general or for King in particular, the record evidence does not show that Dr. Getachew was deliberately indifferent. When Dr. Getachew learned of King's positive COVID-19 test, he ordered that King be placed in isolation and given twice-daily temperature and oxygen saturation checks. ECF 15-3, at 4. King does not dispute the veracity of the medical records reflecting Dr. Getachew's order. King's assertion that the doctor's order was not implemented is not material to whether Dr. Getachew was deliberately indifferent to a serious medical need. Even if Dr. Getachew's orders were not followed, there is no evidence that he knew they were not. Insofar as King argues Dr. Getachew should have followed up after ordering isolation and monitoring and

should have reviewed King's medical records when he learned King had COVID-19, but did neither, ECF 18, at 4, there is no evidence that Dr. Getachew would have learned about a serious medical condition or a need to handle King's COVID-19 infection differently. According to the medical records, King did not complain of any COVID-19-like symptoms until April 2021, five months after his infection.

Dr. Getachew responded reasonably to King's positive test by ordering his quarantine and regular vital checks. King's disagreement with how Dr. Getachew handled his COVID-19 diagnosis is a "'[d]isagreement between an inmate and a physician over the inmate's proper medical care,'" which is "not actionable absent exceptional circumstances." *See Hixson*, 1 F.4th at 302–03 (quoting *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)). King has not shown any exceptional circumstances. Therefore, King cannot prove deliberate indifference based on Dr. Getachew's treatment of his COVID-19 infection.

Additionally, King has not shown that he suffered any harm as a result of the medical staff's alleged failure to isolate him and check his vital signs twice daily as instructed by Dr. Getachew. There is no evidence that he had any symptoms like traditional COVID-19 symptoms until five months following his positive test. ECF 15-6, at 22. Even if his chest pain and breathing difficulties in April, May, and June 2021 were related to his November 2020 infection, King has not suggested any medical care that could or should have been provided after his positive test that would have prevented these alleged complications. Thus, even when the evidence is viewed in the light most favorable to King—assuming that the vital signs medical record is fraudulent and that he was not quarantined or monitored following a positive COVID-19 test—he still has not demonstrated a serious medical need to which Dr. Getachew was deliberately indifferent. Accordingly, summary judgment is granted in Dr. Getachew's favor.

## IV. Conclusion

For the reasons stated herein and by separate order which follows, the defendants' motions to dismiss, or in the alternative, for summary judgment, are GRANTED and Dr. Getachew's motion to strike unauthorized surreply is GRANTED.

September 21, 2022  
Date

                                            Deborah L. Boardman  
                                            United States District Judge